UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MONICA GIACOMI, | : | |
| Plaintiff, | : | |
| v. | : | No. 3:13CV00225(DJS) |
| THE WATERBURY HOSPITAL, | : | |
| INC., | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION AND ORDER

The plaintiff, Monica Giacomi ("Giacomi"), brings this action for monetary damages and equitable relief against the defendant, The Waterbury Hospital, Inc. ("the Hospital"), pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq. ("the ADA") alleging disability discrimination and failure to provide a reasonable accommodation. The Hospital now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). For the reasons that hereafter follow, the Hospital's motion for summary judgment is **GRANTED in part and DENIED in part.**

## I.  SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact is or cannot be disputed must support that assertion by "citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . . " Fed. R. Civ. P. 56(c)(1)(A).

A "material fact" is one whose resolution will affect the ultimate determination of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute concerning a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court "accept[s] as true facts that [are] undisputed by the parties, and resolve[s] disputed facts in favor of the non-moving plaintiff where there [is] evidence to support [her] allegations." Sousa v. Roque, 578 F.3d 164, 166 n.1. "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

Summary judgment is appropriate if, after discovery, the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" Am. Int'l Group v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975)).

## II. FACTS

Before reciting the facts which the Court finds to be undisputed, the Court wishes to address an issue concerning the plaintiff's filings in opposition to the defendant's motion. The

Rules of the United States District Court for the District of Connecticut contain specific requirements pertaining to papers filed in opposition to a motion for summary judgment. Those papers must include a "'Local Rule 56(a)2 Statement,' which states in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 and corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied." L. Civ. R. 56(a)2. In the Local Rule 56(a)2 Statement, each denial of a fact asserted by the moving party "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." L. Civ. R. 56(a)3. "The 'specific citation' obligation of this Local Rule requires counsel and pro se parties to cite to specific paragraphs when citing affidavits . . . ." Id.  Failure to provide this specific citation "may result in the Court deeming certain facts that are supported by the evidence admitted . . . ." Id.

In connection with the consideration of a motion for summary judgment, a district court is not obligated to "perform an independent review of the record to find proof of a factual dispute. A district court is obligated only to consider the materials [properly] cited to it by the parties." Morales v. New York State Department of Labor, 530 F. App'x 13, 14 (2d Cir. 2013) (internal quotation marks and citation omitted). In this regard, the Court notes that "Plaintiff's Local Rule 56(a)2 Statement" does not in all instances properly cite to evidence in the record that supports the plaintiff's denials of assertions made by the defendant. By way of example, the defendant's Local Rule 56(a)1 Statement asserts that "[t]he decision to conduct the RIF [Reduction in Force] or to identify any position for elimination, including the position held by the plaintiff, did not

include the consideration of what benefits any employee, including the plaintiff, was or was not receiving from the Hospital." (Doc. # 31-2, at 12, ¶ 65). That assertion is followed by citations to specific paragraphs in the affidavits of two individuals who were Hospital officials at all times pertinent to the Amended Complaint. (Id). In denying this assertion, Giacomi cites to pages 124-25 of her deposition transcript and all eight pages of her affidavit in opposition to the defendant's motion for summary judgment. The totality of Giacomi's cited deposition testimony is as follows:

> Q       Can you tell me the reasons why you believe you were discriminated against on the basis of your age?
>
> A       Yes. I believe I was a long-term employee and I was making a lot of money, my benefits were very expensive. And I feel as if the Workers' Comp claim came into this also because they were starting to pay out again on my claim.
>
> Q       Well, again, let me refocus on your age discrimination claim for now, all right? Can you tell me the reasons why you believe you were discriminated against on the basis of your age?
>
> A       Because I was a long-term employee making top dollar and had very expensive benefits.
>
> Q       And what is the evidence that you rely on in support of your allegation that you were discriminated against on the basis of your age?
>
> A       Well, how much I was getting paid compared to younger employees.
>
> Q       Anything else?
>
> A       Not that I recall at this time.

(Doc. # 35-8, at 125-26, p. 124:18-25, p. 125:1-16).

-4-

The Court notes that the cited deposition testimony is related to an age discrimination claim which was subsequently withdrawn from this case. In any event, Giacomi's statements merely convey her beliefs or feelings and are unsubstantiated by the evidence presented to the Court. The Court also notes that the plaintiff cited to her entire affidavit as support for her denial of this factual assertion. This is not a "specific citation" as required by Local Rule 56(a)2 and is therefore an inappropriate citation. To the extent that the defendant's factual assertions are properly supported by the evidence and the plaintiff's denials of those assertions are not, the Court will deem those assertions admitted. *See* L. Civ. R. 56(a)3 ("failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence admitted in accordance with Rule 56(a)1").

### A. GIACOMI'S EMPLOYMENT WITH THE HOSPITAL

In 1977 Giacomi was hired by the Hospital. From 1977 to 2005 Giacomi was employed by the Hospital as a staff registered nurse. From 2005 to 2012 she was the Hospital's Assistant Director of Cardiopulmonary Services. As the Assistant Director of Cardiopulmonary Services Giacomi managed the day-to-day operations of six departments, including the Catheterization Laboratory, the Cardio-Pulmonary Rehabilitation Unit, the Stress Laboratory, the EKG Laboratory, the Pulmonary Functional Laboratory, and the Echo-Cardiography Laboratory. Her duties included managing staff, preparing work schedules, evaluating personnel, managing payroll, working on department budgets, and overseeing all quality issues in her departments.

B. GIACOMI'S HEALTH HISTORY

In December 1992 Giacomi fell and injured her right knee and lower back in the Hospital's parking lot. She was out of work on a medical leave of absence from December 14, 1992 to November 8, 1993.[1] As a result of these injuries, Giacomi underwent surgery in 1993. After this surgery Giacomi was medically assigned a 20% permanent partial disability to her lumbar spine. Giacomi additionally experienced bouts of pain and instability in her right knee resulting from a torn meniscus and in 1995 was medically assigned a 16.5% permanent partial disability to her right knee. Giacomi filed a workers' compensation claim against the Hospital relating to her spine and knee injuries. The Hospital accepted this claim and paid for Giacomi's benefits, including medical bills, lost time, and permanency benefits.

In December 2009 Giacomi underwent an additional surgery for her back. At her follow-up examination in June of 2010, Giacomi was medically assigned an additional 15% permanent partial disability. (Doc. # 35-3, at 2). This raised the permanent partial disability rating of her lumbar spine to a total of 35%. Giacomo's knee and back impairments limited her abilities to walk, stand, and climb stairs. She experienced persistent back pain and knee instability and was

---

[1]Giacomi indicates in her affidavit that she also had medical leaves of absence during the following periods: July 15, 1978 to August 14, 1978; October 21, 1980 to January 19, 1981; April 9, 1982 to April 20, 1982; November 8, 1982 to January 17, 1983; and September 18, 1983 to October 6, 1983. (Doc. # 34-1, at 1-2, ¶ 5). The affidavit refers to "numerous medical leaves of absence due to personal injuries I sustained during my employment with the Hospital . . . ." (*Id.* at 1, ¶ 4). Giacomi's affidavit does not provide any further information about these other periods, all of which predate her fall in 1992.

unable to stand, walk, or climb stairs for more than five to six minutes without having to stop or rest.

Giacomi's office was located in the Ambulatory Outpatient Services Department of the Hospital. As part of her usual work practice, Giacomi walked back and forth from her office to the Catheterization Laboratory ("Cath Lab") multiple times a day to perform her work duties relating to that particular lab. The Cath Lab was initially located directly across the hall from Giacomi's office. Giacomi also walked to and from the Hospital's cafeteria, which was located at the opposite end of the building from where her office was located, approximately four times a week to buy lunch. In 2005 Giacomi did not have any difficulty getting to the cafeteria. By 2010, because she was experiencing discomfort walking to and from the cafeteria, Giacomi had to plan her trips to the cafeteria.

## C. CATH LAB RENOVATION AND RELOCATION

In 2009-2010 the Hospital decided to renovate the Cath Lab in order to update the lab's equipment. In planning for the Cath Lab renovation, the Hospital decided to move the Cath Lab to a new location closer to the Hospitals' Emergency Department ("ED"). This decision was made for two reasons: (1) there was insufficient space in the existing Cath Lab for the new equipment, and (2) locating the Cath Lab near the ED was better for patient care, e.g., a patient experiencing a heart attack could be quickly transported from the ED to the new location of the Cath Lab. The Cath Lab's new location near the ED was at the opposite end of the building from where Giacomi's office was located.

-7-

Joanne Borduas ("Borduas"), Giacomi's direct supervisor, was on the Hospital's Executive Management Team, which was responsible for decisions and plans concerning the Cath Lab renovation. Giacomi was added to this team after the decision had been made to move the Cath Lab to a location near the ED. Giacomi did not raise any concerns about the new location of the Cath Lab at any of the planning meetings she attended, but she did raise a concern about the distance from her office to the new location in a conversation she had with Borduas. Giacomi agreed that it made sense, for purposes of patient care, to relocate the Cath Lab closer to the ED.

The Cath Lab renovation was completed in the summer of 2011.  Because the renovated Cath Lab was located at the opposite end of the building from her office, Giacomi had to travel a greater distance from her office in order to access the renovated lab. Giacomi visited the Cath Lab up to six times during the course of a normal workday. After the renovated Cath Lab opened, Giacomi began to express her concerns about the new location to Borduas, telling her that she was having difficulty walking back and forth from her office to the lab due to pain in her back and knee. Giacomi expressed these concerns to Borduas on more than ten occasions after July 2011. On one occasion in the fall of 2011 Giacomi asked Borduas if any accommodation could be made because "it was becoming increasingly more difficult for me to get up to the cath lab and I was having increasing pain." (Doc. # 35-8, at 80, p. 79:7-9). Borduas's response to Giacomi was, "We'll have to see." (*Id.* at 81, p. 80:15-16). After Giacomi asked Borduas about an accommodation, Borduas would frequently ask Giacomi how her back was. On each such occasion, Giacomi told Borduas that her back was not good and that she was in a lot of pain. She

also would tell Borduas that in addition to experiencing pain in her back she had pain in her knee which was being aggravated by standing and walking for long periods.  In the fall of 2011 Giacomi asked Borduas if it would be possible for Giacomi to get an office closer to the Cath Lab because she "was having more and more difficulty and more and more pain trying to walk up to the cath lab multiple times during the day . . . ." (*Id.* at 93, p. 92:14-17). Giacomi never received a response to her inquiry.

In September 2011 Giacomi experienced an episode of chest pain while at work and underwent a cardiac catheterization procedure to determine her medical condition. In April 2012 Doctor Dennis Dobkin, a cardiologist, provided Giacomi's counsel with a letter stating his opinion that her chest pain in 2011 was most likely a result of increased stress at work. In Doctor Dobkin's opinion, stress at work was a "substantial causative factor in her coronary spasm syndrome," classifying it as "most likely and medically probable." (Doc. # 35-4, at 6). Giacomi returned to work sometime after experiencing this episode of chest pain.

### D. HOSPITAL REDUCTION IN FORCE AND GIACOMI'S TERMINATION

The Hospital experienced substantial economic hardship starting in 2008 and continuing into 2012. From fiscal year 2008 through fiscal year 2011 the Hospital lost approximately $34 million. The Hospital saw a loss of $2 million in the first four months of fiscal year 2012 and faced the risk of losing $6 million by the end of that fiscal year. As a result of these losses, the Hospital was in jeopardy of violating its financial bond covenants with the bank that supported its financing.

The Hospital took measures to address its financial difficulties. It initially renegotiated contracts and leases in order to reduce expenses and outsourced some of its services to reduce costs. These measures by themselves, however, were insufficient to address the Hospital's financial losses.  Consequently the Hospital began to consider a Reduction in Force ("RIF") to further reduce expenses. The individuals who decided that an RIF needed to be implemented were John Evans, Interim Chief Operating Officer; Darlene Stromstad, Chief Executive Officer; Charles Thorne, Interim Chief Financial Officer; Michael Cemeno, Chief Information Officer; Diane Woolley, Vice President of Human Resources; and Sandra Iadarola, Chief Nursing Officer (collectively, the "RIF decision-makers"). The decision to implement the RIF was made only because of the Hospital's financial situation.

The RIF decision-makers held planning meetings concerning the implementation of the RIF.  In these meetings, the group reviewed the Hospital's organizational chart and decided to evaluate how administrative and management tasks could be realigned among fewer middle managers, since many of these managers performed overlapping or duplicative functions. The RIF decision-makers agreed that the Outpatient Medical Therapies Department, which included the Cath Lab and the Cardio-Pulmonary Rehabilitation Unit, was one of the Hospital's departments that should be reorganized to realign the duties and responsibilities of management among fewer middle managers.

Interim Chief Operating Officer John Evans identified several middle management positions for potential elimination, including Giacomi's position of Assistant Director of

Cardiopulmonary Services.[2] The RIF decision-makers then agreed that Giacomi's position of Assistant Director of Cardiopulmonary Services was one of the middle manager positions that should be eliminated as part of the RIF. In their planning meetings none of the RIF decision-makers discussed or suggested that the RIF should be implemented because any Hospital employee had a disability or that the Hospital wished to terminate Giacomi's employment because of any medical condition or disability she had. Likewise none of the RIF decision-makers discussed whether Giacomi had requested any accommodation for a disability she claimed to have. Neither the decision to implement the RIF nor the identification of specific positions for elimination included the consideration of benefits any Hospital employee was or was not receiving from the Hospital.

On January 2, 2012, Susan Arcari, a Senior Account Claim Representative of PMA Companies, sent an email to Susan Keeley, a Workers' Compensation Analyst at Waterbury Hospital. (Doc. #35-5 at 2). This email read in part as follows: "Heads up! Since I am paying the remaining PPD [permanent partial disability] that is owed her she now has to treat again and they want MRI lumbar and CT scan. . . . It's my understanding she still works at WH [Waterbury Hospital] - - is she really the asst director for the cardiopulmonary dept?" (Doc. # 35-5, at 2).

--------

[2]In her Local Rule 56(a)2 Statement, Giacomi denies the corresponding paragraph, i.e., paragraph 48, of the Hospital's Local Rule 56(a)1 Statement. In doing so, Giacomi cites to paragraph 14 of her own affidavit. However, that paragraph only concerns oversight of the Hospital's Outpatient Services "which included the oversight of the Outpatient Medical Therapies Department" and states that Borduas was responsible for that oversight. (Doc. # 34-1, at 3, ¶ 14). While Giacomi may dispute which Hospital employee was responsible for the Outpatient Medical Therapies Department, her affidavit does not dispute, or even address, the facts that Evans identified her position for potential elimination and that the RIF decision-makers collectively agreed that her position should be eliminated as part of the RIF.

-11-

According to Giacomi, she was being ridiculed in this email by the Hospital's agents due to the increased activity, i.e., need for medical treatment, in her workers' compensation file. During a telephone conversation with Keeley on or about February 1, 2012, Giacomi "was cautioned that [her] workers' compensations claims (medical treatment) were becoming extremely active again. Since 1977, the Hospital has always contributed monetarily to fund its employees welfare benefits. " (Doc. # 34-1, at 6, ¶ 36).

The Hospital's RIF was implemented over the course of several days in late February 2012. In total, the Hospital laid off fifty-two employees, eliminated approximately twenty vacant positions, and decreased hours for approximately fifteen employees. The RIF affected approximately 5% of the Hospital's total workforce of 1,700 full-time positions. The Hospital estimated that it saved approximately $4.4 million through the RIF. As part of the RIF, Borduas was laid off on February 20, 2012.

On February 21, 2012, Giacomi was notified that her position had been eliminated. Evans told Giacomi that her employment with the Hospital was being terminated for financial reasons. The Unemployment Notice given to Giacomi had the "Lack of Work" box checked under the section "Reason for Unemployment." (Doc. #35-7, at 2). The other options under the "Reason for Unemployment" section were "Voluntary Leaving," "Discharge/Suspension," "Leave of Absence," and "Other." (Id). Each of the fifty-two employees the Hospital laid off received an Unemployment Notice that had the "Lack of Work" box checked in the "Reason for Unemployment" section. (Doc. #38-1, at 4 ¶ 9). The record does not indicate that Evans mentioned the RIF or gave any specific information regarding the Hospital's financial troubles at

the time he notified Giacomi that her position had been eliminated. Giacomi was aware, however, that the Hospital was experiencing financial difficulties. She had also heard rumors that there were going to be reductions to the Hospital's workforce and knew that her immediate supervisor, Borduas, had been laid off the day before her own layoff. After Giacomi was laid off by the Hospital, her former duties and responsibilities were transferred to other Hospital employees.

### III. DISCUSSION

Giacomi brings her Amended Complaint in two counts, each of which raises a claim under the ADA.[3] The Hospital argues that there are no material facts genuinely in dispute and that it is entitled to judgment as a matter of law. Giacomi argues that she has provided the Court with sufficient evidence to show the Hospital discriminated against her based on her disabilities. The Court shall address the parties' arguments seriatim.

### A.  ADA REASONABLE ACCOMMODATION

In Count One of her Amended Complaint, Giacomi claims that the Hospital violated the ADA by not providing her with reasonable accommodations for her disabilities. An employer may violate the ADA by failing to provide a reasonable accommodation. As the Second Circuit has noted:

> A plaintiff states a prima facie failure to accommodate claim
> by demonstrating that: (1) plaintiff is a person with a disability
> under the meaning of the ADA; (2) an employer covered by the

---

[3]Giacomi's initial Complaint also contained age and gender discrimination claims. These claims were not included in her Amended Complaint.

> statute had notice of his disability; (3) with reasonable accommodation,
> plaintiff could perform the essential functions of the job at issue; and
> (4) the employer has refused to make such accommodations.

McMillan v. City of New York, 711 F.3d 120, 125-26 (2d Cir. 2013) (internal quotation marks

omitted). See also 42 U.S.C. § 12112(b)(5)(A) (discrimination under the ADA includes "not

making reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability").

The Hospital acknowledges that it is subject to the ADA and, for purposes of this motion

only, is not disputing that Giacomi is a person with a disability under the meaning of the ADA[4]

or that with reasonable accommodation Giacomi could perform the essential functions of her job.

What the Hospital does dispute is that it had notice of Giacomi's disability, and that Giacomi

requested an accommodation for her disability.

### 1. Notice of Disability

Giacomi contends that she has a qualifying disability under the ADA on the basis of

permanent physical impairments to her spine and knee which significantly restrict her ability to

walk, stand, or climb stairs and produce persistent back pain and knee instability. The Hospital

argues that "the plaintiff has failed to establish that the Hospital had notice of her disability."

(Doc. # 31-3, at 15). The  Hospital concedes, however, that for purposes of this motion Giacomi

is a person with a disability under the meaning of the ADA. Giacomi has produced evidence that

the Hospital accepted a workers' compensation claim and paid benefits relating to Giacomi's

---

[4]The Hospital notes that amendments to the ADA that became effective January 1, 2009,
"broadened the definition of what constitutes a disability and rejected the strict standards"
previously set forth by the Supreme Court. (Doc. # 31-1, at 11 n.3).

spine and knee injuries. She has also produced evidence that after the relocation of the Cath Lab she informed her supervisor, Borduas, on numerous occasions of the pain and difficulties relating to her spine and knee impairments that she was experiencing as a result of having to make the longer trip to the relocated lab. Giacomi testified at her deposition that she told Borduas "it was becoming increasingly more difficult for me to get up to the cath lab and I was having increasing pain." (Doc. # 35-8, at 80, p. 79:7-9). As previously noted, the Hospital does not dispute, for purposes of this motion, that Giacomi has a qualifying disability under the ADA. Since Giacomi has identified her disability in terms of permanent physical impairments to her spine and knee, and since Giacomi has produced evidence that the Hospital was aware of the permanent physical impairments to her spine and knee, the Court concludes that Giacomi has demonstrated notice for purposes of establishing a prima facie case of failure to accommodate.

## 2.   Accommodation Request

For purposes of a failure to accommodate claim under the ADA,  "generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006) (internal quotation marks omitted). The defendant argues that Giacomi "failed to establish that she requested an accommodation from the Hospital." (Doc. #31-1, at 16). The Hospital acknowledges, as it must, that Giacomi testified at her deposition that she asked Borduas "for an accommodation sometime in the 'fall of 2011' to facilitate her walk to and from the Cath Lab." (Id.). The Hospital goes on to argue, however, that "the plaintiff's recollection of that alleged conversation is inconsistent at best," and seeks to contrast Giacomi's deposition testimony with what it describes as the "clear

-15-

and concise " deposition testimony of Borduas, who testified that Giacomi never requested an accommodation from her.  (Id.). The Hospital also points out that Giacomi never made a written request for an accommodation, never sought an accommodation from the Hospital's human resources department or from Borduas' supervisor, and was never advised by a doctor that she needed an accommodation.

Giacomi testified at her deposition that she asked Borduas if any accommodation could be made to address the increased pain and difficulty she was experiencing traveling to and from the relocated Cath Lab multiple times per day.  When asked about the details of her conversation with Borduas, Giamcomi answered as follows:

> I had asked if there were any kind of accommodations that could
> be made and the conversation really didn't go anywhere from
> there. I wasn't asked what kind of accommodations, what I
> thought. I just merely said that it was becoming increasingly
> more difficult for me to get up to the cath lab and I was having
> increasing pain. And then there was no other conversation
> about that.

(Doc. # 35-8, at 80, p. 79:2-10). Giacomi could not give an exact date when this conversation took place, but she thought it was in the fall of 2011. When asked what Borduas' response was to the request for an accommodation, Giacomi answered, "Just that we'd have to see." (Id. at 81, p. 80:11).

At a later point in her deposition, Giacomi testified as follows:

-16-

Can I clarify something? When we spoke before about the
accommodations and I talked about the devices and things,[5] one
of the other things that I had requested was if I could move my
office up closer to the cath lab and that was never addressed
either . . . as an accommodation.

(Id. at 92, p. 91:16-21, 23). Giacomi indicated that this request was made in a conversation
she had with Borduas that took place after the opening of the relocated Cath Lab and probably
occurred during the fall of 2011. Giacomi was then asked about the specifics of what was said at
that meeting with Borduas:

Q.  And what is it precisely that you recall was said at that meeting?
A.  Basically, that I was having more and more difficulty and
more and more pain trying to walk up to the cath lab multiple times
during the day and would it be possible if I could get an office up
there. And it was never really answered, as far as if that was a
possibility or not.
Q.  So your recollection is that you generally said - - you generally
made those comments and there was no response from Miss
Borduas?
A.  Yes.
Q.  She didn't say anything to you?
A.  Not that I recall.

---

[5]When she initially testified that she had requested an accommodation, Giacomi was asked what
accommodation she had in mind and responded by saying she had thought about some type of
mobility device such as "a wheelchair or . . . a scooter or something like that." (Doc. # 35-8, at
82, p. 81:1-2).

(Id. at 93, p. 92:12-25; at 94, p. 93:1-2).

Giacomi has provided competent evidence that she requested an accommodation from her direct supervisor. See Peterson v. Connecticut Light & Power Co., No. 3:10-cv-02032 (JAM), 2014 U.S. Dist. LEXIS 80256, at *6-7  (D. Conn. June 12, 2014) ("[Plaintiff's] specific factual allegations about statements made to her and by her are far from 'conclusory' and plainly proper for consideration at the summary judgment stage."). "[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented . . . ." Agosto v. Immigration & Naturalization Service, 436 U.S. 748, 756 (1978). The Court views the Hospital's argument that Borduas' testimony was clear and concise, as opposed to what it characterizes as the inconsistent testimony of Giacomi, as an invitation to assess the credibility of the evidence presented. This the Court cannot do. For purposes of this motion, the Court finds that Giacomi has established that she requested an accommodation from the Hospital.

Giacomi has testified that the Hospital failed to respond to her accommodation request. The Hospital, since it contends that no accommodation request was made, does not argue that it responded to any request made by Giacomi. The Second Circuit has "laid out a two-step process to evaluate whether the failure to provide a proposed accommodation constitutes a violation of the ADA. First, the plaintiff bears the burden of proving . . . that an accommodation exists that permits her to perform the job's essential functions. If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant." Jackan v. New York State Department of Labor, 205 F.3d 562, 566 (2d Cir. 2000) (internal quotation marks and citation omitted).

Giacomi testified at her deposition that she requested as an accommodation the relocation of her office to a site closer to the renovated Cath Lab. She has also submitted an affidavit in which she avers that "space was available " for such a move. (Doc. # 34-1, at 6, ¶ 35). The Court finds that Giacomi has satisfied her burden of "suggest[ing] the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits. Once the plaintiff has done this, she has made out a *prima facie* showing that a reasonable accommodation is available, and the risk of nonpersuasion falls on the defendant." Borkowski v. Valley Central School District, 63 F.3d 131, 138 (2d Cir. 1995). "At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship." Id. The Hospital, relying on its contention that no accommodation request was ever made, has not met this burden. Consequently the Hospital's motion for summary judgment is denied as to Giacomi's failure to accommodate claim.[6]

## B. ADA ADVERSE EMPLOYMENT ACTION

In Count Two of her Amended Complaint, Giacomi claims that the Hospital violated the ADA by terminating her employment due to her disabilities. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . ." 42 U.S.C. § 12112 (a). ADA

---

[6]These circumstances might also support an ADA accommodation claim based on the Hospital's failure to engage in a sufficient interactive process. See McBride v. BIC Consumer Products Mfg. Co., 583 F.3d 92, 101 (2d Cir. 2009) ( "It is even possible, although we need not decide the issue here, that a failure to engage in a sufficient interactive process where accommodation was, in fact, possible constitutes prima facie evidence of discrimination on the basis of disability.").

employment discrimination claims are analyzed using the burden-shifting framework articulated

by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under

<u>McDonnell Douglas</u>, "[a] plaintiff must establish a prima facie case; the employer must offer

through the introduction of admissible evidence a legitimate non-discriminatory reason for the

discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that

the proffered reason is a pretext." <u>Sista v. CDC Ixis North America, Inc.</u>, 445 F.3d 161, 169 (2d

Cir. 2006).

### 1.  Prima Facie Case

To establish a prima facie case of employment discrimination under the ADA, a

plaintiff must show:

> (a) that her employer is subject to the ADA; (b) that she is
> disabled within the meaning of the ADA or perceived to be
> so by her employer; (c) that she was otherwise qualified to
> perform the essential functions of the job with or without
> reasonable accommodation; and (d) that she suffered an
> adverse employment action because of her disability.

<u>Turner v. Eastconn Regional Education Service Center</u>, 588 F. App'x 41, 43 (2d Cir.

2014) (internal quotation marks and alterations omitted). The Hospital admits it is subject to

the ADA, and, for purposes of this motion only, assumes that Giacomi was disabled within

the meaning of the ADA and was otherwise qualified to perform the essential functions of her

job with or without accommodation. What the Hospital does dispute is that Giacomi has

shown that she was terminated on the basis of the disability she alleges, i.e., the permanent impairments to her spine and knee. Giacomi contends that she has met the burden of her prima facie case on the basis of temporal proximity, i.e., the short period of time between when she was "cautioned" about her worker's compensation claims and when she was terminated.

A plaintiff's burden at the prima facie stage of McDonnell Douglas has been characterized as "minimal" and "de minimis." Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005) (internal quotation marks omitted). The Court will assume, for the sake of argument, that the evidence cited by Giacomi is sufficient to satisfy her burden of establishing a prima facie case of employment discrimination. The burden then shifts to the Hospital to articulate a legitimate, non-discriminatory reason for the adverse employment action. The Hospital clearly satisfied its burden at this second step of the McDonnell Douglas analysis. The Hospital has provided evidence that Giacomi's position was eliminated as part of a Hospital-wide RIF that was implemented in response to significant financial problems and resulted in the layoffs of fifty-two employees, the elimination of twenty vacant positions, and a decrease in hours for approximately fifteen employees.

The burden then shifts back to Giacomi to "produce[] evidence that would tend to show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." Sista, 445 F.3d at 173 (internal quotation marks omitted).

Giacomi's argument that the Hospital's proffered reason for her termination was a pretext for discrimination relies on both the evidence comprising her prima facie case, i.e., the remarks about her worker's compensation claims, and additional evidence she claims shows that the Hospital's explanation is unworthy of credence.

Giacomi's argument relies, in part, on a remark made to her by Susan Keeley ("Keeley"), a Workers' Compensation Analyst at the Hospital. On or about February 1, 2012, twenty days before her termination, Giacomi "was cautioned [by Keeley] that my workers' compensations claims (medical treatment) were becoming extremely active again. Since 1977, the Hospital has always contributed monetarily to fund its employees welfare benefits." (Doc. # 34-1, at 6, ¶ 36). "Assuming that a reasonable juror could identify [disability] bias in the cited remarks, we nevertheless conclude that they do not raise a triable issue of employment discrimination." Wesley-Dickson v. Warwick Valley Central School District, 586 F. App'x 739, 743 (2d Cir. 2014).  In reaching that conclusion in Wesley-Dickson, the Second Circuit noted, among other things, that the person who made the remarks at issue was not involved in the decisions to take the adverse employment actions challenged by the plaintiff. "Remarks made by someone other than a decision-maker (with respect to the adverse employment action) 'may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark.'" Muoio v. Costco Wholesale Corp., No. 3:13-cv-44 (SRU), 2015 U.S. Dist. LEXIS 4239, at *24 (D. Conn. Jan. 14, 2015) (quoting Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir.

2007), abrogated on other grounds by Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009)).

The adverse employment action at issue in this case is Giacomi's termination. In that regard the Court notes that Giacomi admits in her Local Rule 56(a)2 Statement that Keeley was not involved in the decision to implement the RIF or to select Giacomi's position for elimination. She further admits that the decision to implement the RIF was made only because of the Hospital's financial situation and that in the meetings held by the RIF decision-makers, no one discussed or suggested that the RIF should be conducted because any Hospital employee had a disability or because the Hospital wanted to terminate Giacomi's employment because of any medical condition or disability she may have had. Given these facts, the Court concludes that the remark made to Giacomi by Keeley is not probative of discriminatory intent on the part of the decision-makers with respect to Giacomi's termination. See Vogel v. CA, Inc., 44 F. Supp. 3d 207, 223 (D. Conn. 2014) ("In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion." (internal quotation marks omitted)).

Giacomi also argues that the Hospital provided two different reasons for her termination. At the time of her termination she was told by Interim Chief Operating Officer John Evans that the decision to lay her off was a "financial decision." (Doc. # 34-1, at 6-7, ¶ 40). In the Unemployment Notice relating to Giacomi, however, the Hospital checked the box marked "Lack of Work" as the Reason for Unemployment. (Doc. # 35-7, at 2). Giacomi contends that this inconsistency shows that the proffered reason, i.e., financial difficulties,

was merely a pretext for discrimination "[A] plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at [the pretext] stage." Kwan v. Andalex Group, LLC, 737 F.3d 834, 847 (2d Cir. 2013).

The Hospital counters with the argument that the "Lack of Work " box was checked on the Unemployment Notice because Giacomi's position was eliminated and, since she had no position to perform, she lacked work. Consequently, according to the Hospital, there is no inconsistency between what Giacomi was told at the time she was terminated and what is indicated on the Unemployment Notice.

The Court believes a  reasonable juror might find that there is an inconsistency between what Giacomi  was told and what is indicated on the unemployment form. That does not end the Court's inquiry, however. "'To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.'" Ramlal-Nankoe v. Ithaca College, 591 F. App'x 23, 25 (2d Cir. 2015) (quoting Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000)). See also Abdel-Raouf v. Yale University, Civ. No. 3:12CV776 (HBF), 2015 U. S. Dist. LEXIS 18966, at *5 (D. Conn. Feb. 18, 2015) (internal quotation marks omitted) ("A proffered reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.").

It is undisputed that fifty-two Hospital employees were laid off through the implementation of the RIF. There is also evidence in the record that "[t]he Hospital checked

the box 'lack of work' for each of the employees laid off pursuant to the RIF, including Ms. Giacomi . . . ." (Doc. # 38-1, at 4, ¶ 9). According to the Hospital the lack of work box was checked for all these employees  "because their positions were eliminated, and, therefore, those employees no longer had a position to perform. As such, they lacked work." (Id.). While questions might be raised about the Hospital's explanation of its reason for checking the lack of work box, the fact that the same box was checked for all fifty-two employees who were laid off, including Giacomi, does not support the argument that the Hospital's proffered reason for Giacomi's termination was a pretext for disability discrimination.

Relying on the Second Circuit's decision in Gallo v. Prudential Residential Services, Limited Partnership, 22 F.3d 1219 (2d Cir. 1994),  Giacomi also argues that the fact that her duties did not cease but were transferred to other Hospital employees is further evidence that the Hospital's proffered reason for her termination was a pretext for discrimination. The Court finds the circumstances in Gallo to be quite different from those in the instant action. The plaintiff in Gallo was discharged as part of what was characterized by the defendant as a reduction in force and some of her duties were initially eliminated. Within one year after her discharge, however, the defendant hired a different individual who performed many of Gallo's former duties. Although Gallo applied for this new position, the defendant, contrary to its own policy manual, failed to give her an interview. Under these circumstances, the Second Circuit concluded that Gallo had demonstrated genuine issues of fact regarding whether the employer's reduction in force explanation was a pretext for intentional age discrimination.

Giacomi does not dispute that the RIF decision-makers "agreed that the Outpatient Medical Therapies Department was one of several Hospital departments that should be reorganized to streamline its functions and realign the duties and responsibilities of management among fewer middle managers." (Doc. # 31-2, at 8, ¶ 47; Doc. # 34, at 3, ¶ 47). The transfer of  Giacomi's duties to other Hospital employees is consistent with that objective. The evidence before the Court indicates that no new employee was hired to perform duties formerly performed by Giacomi and that no employee has held the position of Assistant Director of Cardiopulmonary Services since Giacomi's employment was terminated in February 2012. Under theses circumstances the transfer of Giacomi's duties to other Hospital employees is not evidence that the Hospital's proffered reason for her termination is a pretext for disability discrimination.

Under McDonnell Douglas  "the final and ultimate burden is on the plaintiff to establish that the defendant's reason [for the adverse employment action] is in fact pretext for unlawful discrimination." Abrams v. Department of Public Safety, 764 F.3d 244, 251 (2d Cir. 2014). The Court concludes that Giacomi has not satisfied her "final and ultimate burden" and for that reason the Hospital's motion for summary judgment is granted as to Giacomi's claim that the Hospital violated the ADA by terminating her employment due to her disabilities.

**CONCLUSION**

For the foregoing reasons, the Hospital's motion for summary judgment (**doc. # 31**) is **GRANTED in part and DENIED in part.** The motion is granted as to the claim

-26-

that the Hospital violated the ADA by terminating Giacomi's employment due to her

disabilities and denied as to the claim that the Hospital violated the ADA by not

providing Giacomi with a reasonable accommodation for her disability.

This case will proceed only as to the claim that the Hospital failed to provide

Giacomi with a reasonable accommodation for her disability between the time she alleges

she first requested an accommodation and the time her employment at the Hospital ended.

SO ORDERED this    18th    day of June,  2015

___/s/ DJS_____
Dominic J. Squatrito
United States District Judge

-27-